**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FAIRLY ODD TREASURES, LLC,

      Plaintiff,                              Civil Action No.: 1:20-cv-01488

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

      Defendants.

**COMPLAINT**

Plaintiff, Fairly Odd Treasures, LLC ("FOT" or "Plaintiff") hereby files this Complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and for its Complaint hereby alleges as follows:

**JURISDICTION AND VENUE**

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq. 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial Internet stores operating under the Defendant domain names and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant

Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing counterfeit versions of Plaintiff's trademark. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit versions of Plaintiff's federally registered trademark to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## INTRODUCTION

3.      This action has been filed by Plaintiff to combat online counterfeiters who trade upon Plaintiff's reputation and goodwill by selling and/or offering for sale products in connection with Plaintiff's MR. BANANA Trademark, which is covered by U.S. Trademark Registration No. 5,222,732. The registration is valid, subsisting, unrevoked, uncancelled, and incontestable pursuant to 15 U.S.C. § 1065. The registration for the trademark constitutes prima facie evidence of validity and of Plaintiff's exclusive right to use the trademark pursuant to 15 U.S.C. § 1057(b). A genuine and authentic copy of the U.S. federal trademark registration certificate for the MR. BANANA Trademark is attached as **Exhibit 1**.

//


//

4.      Plaintiff is located in Concord, North Carolina and started as a small online business that has grown to include four worldwide distribution centers:



https://fairlyoddtreasures.com/about-us/

5.      A substantial revenue source of FOT is the development and online sales of novelty items that Plaintiff protects by investing in trademark. In the past, FOT has also used takedowns to protect its products but has found that such efforts are ineffective as it just causes the company to expend resources playing an endless game of "whack-a-mole."

6.      The failure rate of novelty items is around 90% as there is no accurate way to predict what products resonate with consumers. Despite the odds stacked against it, the MR. BANANA products have been a tremendous success. However, once it became apparent that the product was

successful, the counterfeiters appeared. At first, there were just a few, but the few turned into hundreds after the product continued to gain popularity and financial success. The aggregated harm caused by the appearance of the mass counterfeiting has driven the price of the counterfeit products downward and overwhelmed Plainitff's ability to police its rights.

7.      Below are a link and the screenshot of where FOT's authentic MR. BANANA products can be purchased from, versus the counterfeiters selling the illegal product at prices substantially below an original:



8.      The above example of one of the Defendant Aliases evidences a cooperative counterfeiting network using fake eCommerce storefronts designed to appear to be selling authorized products. To be able to offer the counterfeit products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising and shipping requires an economy of scale only achievable through a cooperative effort

throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.
>
> . . .
>
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 2.**

9.      The Defendant Aliases share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of

their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases

enables counterfeiters to stymie authorities:

> The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.
>
> . . .
>
> A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.
>
> . . .
>
> Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

10. eCommerce giant Alibaba has also made public its efforts to control

counterfeiting on its platform. It formed a special task force that worked in conjunction with

Chinese authorities for a boots-on-the ground effort in China to stamp out counterfeiters. In

describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing

with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable

counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20



BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

*See* Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm (**Exhibit 3).**

11.    Plaintiff has been and continues to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and good-will as well as the quality of goods bearing the trademark. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters:

Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organization for Economic Cooperation and Development (OECD) report, which details a 154

percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.

…

The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

. . .

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2**) at 4, 8, 11.

12.     Not only are the creators and brand holders harmed, but the public is also harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.

The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

*Id.* at 3. (Underlining in original)

13.     Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, Schedule A shows the use of store names that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Internet Stores are using fake online storefronts designed to appear to be selling genuine Plaintiff products, while selling inferior imitations of the Plaintiff's products. The Defendant Internet Stores also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of the Plaintiff's registered trademark, as well as to protect unknowing consumers from purchasing unauthorized MR. BANANA products over the Internet. Lastly, Plaintiff's investigation has discovered that one of the named defendants in the present action is a factory that produces thousands of products a month that appear to be supplied to the rest of the counterfeiting ring which are unauthorized and counterfeit copies of the  MR. BANANA products, evidenced by the factory descriptions such as "factory direct sales"      as      well      as      "are      produced      in      all      factories":



14.     This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this Judicial District. In addition, each defendant has offered to sell and ship infringing products into this Judicial District.

## THE PLAINTIFF

15. Plaintiff, Fairly Odd Treasures, LLC, is a limited liability company that maintains its principal place of business at 56 McCachern Blvd. SE, Concord, North Carolina 28025. Plaintiff is engaged in the business of manufacturing, distributing and retailing high-quality novelty toys, gifts and accessories such as the FOT line of toy miniature golf putting green set for use in the bathroom comprised of a putting practice mat, putter, ball and hole, including within the Northern District of Illinois District (collectively, the "Plaintiff Products") under the federally registered MR. BANANA Trademark. Defendants' sales of Counterfeit Products in violation of the Plaintiff's intellectual property rights are irreparably damaging Plaintiff.

16. Plaintiff's brand, symbolized by the MR. BANANA Trademark, is a recognized symbol of high-quality novelty toy, gift and accessory products. The MR. BANANA Trademark is distinctive and identifies the merchandise as goods from Plaintiff. The registration for the MR. BANANA Trademark constitutes prima facie evidence of its validity and of Plaintiff's exclusive right to use the MR. BANANA Trademark pursuant to 15 U.S.C. § 1057 (b).

17. The MR. BANANA Trademark is distinctive and identifies the merchandise as goods from Plaintiff. The registration for the trademark constitutes prima facie evidence of validity and of Plaintiff's exclusive right to use the trademark pursuant to 15 U.S.C. § 1057(b). The MR. BANANA Trademark has been continuously used and never abandoned.

18. Plaintiff has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the MR. BANANA Trademark. More importantly, because Plaintiff's products are novelty bottle stoppers and accessories, Plaintiff maintains strict quality control standards for all products featuring the Plaintiff's MR. BANANA mark. Plaintiff's authentic MR. BANANA products feature a unique design, instantly recognizable to consumers.

Over the life of the MR. BANANA products, Fairly Odd Treasures has invested significant resources to market and promote the products around the world. As a result, products bearing the MR. BANANA Trademark are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Plaintiff.

## THE DEFENDANTS

19. Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit MR. BANANA products to consumers within the United States, including Illinois and in this Judicial District.

## THE DEFENDANTS' UNLAWFUL CONDUCT

20. The success of the MR. BANANA brand has resulted in its counterfeiting. Defendants conduct their illegal operations through fully interactive commercial websites hosted on various e-commerce sites, such as, but not limited to, WISH, Amazon, Alibaba, DHGate, etc. ("Infringing Websites" or "Infringing Webstores"). Each Defendant targets consumers in the United States, including the State of Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit products that violate Plaintiff's intellectual property rights ("Counterfeit Products") to consumers within the United States, including the State of Illinois. Defendants have persisted in creating the Defendant Aliases. eCommerce sales, including eCommerce Internet stores like those of Defendants, have resulted in a sharp increase in the

shipment of unauthorized products into the United States. *See* **Exhibit 4**, Department of Homeland Security, *Fiscal Year 2018 Seizure Statistics Report*. According to Customs and Border Patrol's ("CBP") report, over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). *Id.* Over 85% of CBP seizures originated from mainland China and Hong Kong. *Id.* Counterfeit and pirated products account for billions in economic losses, resulting in tens of thousands of lost jobs for legitimate businesses and broader economic losses, including lost tax revenue.

21.     Counterfeiting rings are able to take advantage of the anonymity provided by the Internet which allows them to evade enforcement efforts to combat counterfeiting. For example, counterfeiters take advantage of the fact that marketplace platforms do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these Internet platforms." **Exhibit 5**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 41 Nw. J. Int'l L. & Bus. 24 (forthcoming 2020). Further, "Internet commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." *Id.* at 25. This lack of meaningful regulation allows the Defendants to garner sales from Illinois residents by setting up and operating eCommerce Internet stores that target United States consumers using one or more seller aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold counterfeit products to residents of Illinois.

22.     Shrouding their counterfeiting operation in anonymity allows the defendants to operate as a ring of counterfeiters operating on eCommerce sites such as WISH, Amazon, Alibaba, DHGate. Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are

present in the instant action. For example, the online storefront names set forth in Schedule A employ unconventional nomenclature designed to conceal identifying information of the true owner. Instead, the seller names appear to be made up aliases. Thus, the Defendant Aliases are using fake online storefronts designed to appear to be selling genuine Plaintiff products, while selling inferior imitations of Plaintiff's products.

23.     Another telltale sign of a mutually cooperative counterfeiting ring in operation is that, on information and belief, Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling counterfeit products. Such seller alias registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

24.     On information and belief, the level of cooperation between the Defendants is so significant that they are in constant communication with each other and regularly participate in all kinds of online private chat rooms and through websites such as sellerdefense.cn regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

25.     Upon information and belief, Defendants facilitate sales by concurrently employing and benefitting from substantially similar advertising and marketing strategies as well as by designing the Defendant Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine MR. BANANA products. Many of the Defendant Aliases look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal.  Defendant Aliases often include images and design elements that make it very difficult for consumers to distinguish such unauthorized sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized

retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. Plaintiff has not licensed or authorized Defendants to use the MR. BANANA Trademark.

26. Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Aliases. Upon information and belief, Defendants regularly create new online marketplace accounts on various platforms using the identities listed in Schedule A of the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Alias registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive infringing operation, and to avoid being shut down.

27. Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Aliases. For example, many of the Defendant Aliases have virtually identical layouts. In addition, many of the unauthorized MR. BANANA products for sale in the Defendant Aliases bear similarities and indicia of being related to one another, suggesting that the illegal products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. Such commonalities include incomplete logos, improper spelling and other written materials.

28. The Defendant Aliases also include other notable common features, including lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

29. Further, illegal operators such as Defendants typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. accounts, (collectively "PayPal"), behind layers of payment gateways so that they can continue operating in spite of any enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly

move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore operators regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

30. Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

31. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered MR. BANANA Trademark in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The MR. BANANA Trademark is a highly distinctive mark. Consumers have come to expect the highest quality from Plaintiff's products provided under the MR. BANANA Trademark.

32. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the MR. BANANA Trademark without Plaintiff's permission.

33. Plaintiff is the exclusive owner of the MR. BANANA Trademark. Plaintiff's United States Registration for the MR. BANANA Trademark (**Exhibit 1**) is in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in the MR. BANANA Trademark, and are willfully infringing and intentionally using counterfeits of the MR. BANANA Trademark. Defendants' willful, intentional and unauthorized use of the MR. BANANA Trademark is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

34.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

35.     Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its well-known MR. BANANA Trademark.

36.     The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit MR. BANANA products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

37.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

38.     Defendants' promotion, marketing, offering for sale, and sale of counterfeit MR. BANANA products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' counterfeit MR. BANANA products by Plaintiff.

39.     By using the MR. BANANA Trademark in connection with the sale of counterfeit MR. BANANA products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit MR. BANANA products.

40.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit MR. BANANA products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

41.     Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS § 510, et seq.)

42.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

43.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their counterfeit MR. BANANA products as those of Plaintiff, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine MR. BANANA products, representing that their products have Plaintiff's approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

44.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

45.     Plaintiff has no adequate remedy at law, and Defendants' conduct has caused Plaintiff to suffer damage to its reputation and goodwill. Unless enjoined by the Court, Plaintiff will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## COUNT IV
## CIVIL CONSPIRACY

46.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

47.     Plaintiff is informed and believe and thereon allege that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, engaging in collaborated efforts for the distribution,

marketing, advertising, shipping, offering for sale, or sale of fake MR. BANANA products which are a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

48.     The intent, purpose and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to undermine the Plaintiff and its business by unfairly competing against it as described above.

49.     The Defendants each understood and accepted the foregoing scheme and agreed to do their respective part, to further accomplish the foregoing intent, purpose and objective. Thus, by entering into the conspiracy, each Defendant has deliberately, willfully and maliciously permitted, encouraged, and/or induced all of the foregoing unlawful acts and misconduct.

50.     As a direct and proximate cause of the unlawful acts and misconduct undertaken by each Defendant in furtherance of the conspiracy, FOT has sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate and irreparable harm, damage and injury for which FOT has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily preliminarily, and permanently enjoined and restrained from:

   a.   using the MR. BANANA Trademark or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine MR. BANANA product or is not authorized by Plaintiff to be sold in connection with the MR. BANANA Trademark;

b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine MR. BANANA product or any other product produced by Plaintiff that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the MR. BANANA Trademark;

c.  committing any acts calculated to cause consumers to believe that Defendants' counterfeit MR. BANANA products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d.  further infringing the MR. BANANA Trademark and damaging Plaintiff's goodwill;

e.  otherwise competing unfairly with Plaintiff in any manner;

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any Plaintiff trademark, including the MR. BANANA Trademark, or any reproductions, counterfeit copies, or colorable imitations thereof;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the online marketplace accounts, the Defendant domain names, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit MR. BANANA products; and

h.  operating and/or hosting websites at the Defendant domain names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the MR. BANANA Trademark or any reproduction, counterfeit copy or colorable imitation thereof that is not

a genuine MR. BANANA product or not authorized by Plaintiff to be sold in connection with the MR. BANANA Trademark; and

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiff a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through h, above;

3) Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as, but not limited to, Amazon, ContextLogic, DHGate, and Alibaba Group Holding Ltd., Alipay.com Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant domain names, and domain name registrars, shall:

    a. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit MR. BANANA products using the MR. BANANA Trademark, including any accounts associated with the Defendants listed on Schedule A;

    b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit MR. BANANA products using the MR. BANANA Trademark; and

    c. take all steps necessary to prevent links to the Defendant domain names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant domain names from any search index; and

5)  That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the MR. BANANA Trademark be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

6)  In the alternative, that Plaintiff be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the MR. BANANA Trademark;

7)  That Plaintiff be awarded its reasonable attorneys' fees and costs; and

8)  Award any and all other relief that this Court deems just and proper.

DATED:  February 28, 2020

Respectfully submitted,

*/s/ Keith A. Vogt*
Keith A. Vogt (Bar No. 6207971)
Keith Vogt, Ltd.
111 West Jackson Boulevard, Suite 1700
Chicago, Illinois 60604
Telephone: 312-675-6079
E-mail:  keith@vogtip.com

**ATTORNEY FOR PLAINTIFF**